[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13384

_____

D.C. Docket No. 5:17-cv-00025-CAR-MSH

WASEEM DAKER,

Plaintiff-Appellant,

versus

TIMOTHY WARD,
Assistant Commissioner,
JACK KOON,
Facilities Director,
STEVE UPTON,
Deputy Facilities Director,
OTIS STANTON,
State Wide Tier Coordinator,
JENNIFER AMMONS,
General Counsel,
STATE OF GEORGIA, et al.

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 7, 2021)

Before WILSON, ROSENBAUM and HULL, Circuit Judges.

HULL, Circuit Judge:

Waseem Daker, a Georgia prisoner serving a life sentence for murder, appeals the district court's order that dismissed his 42 U.S.C. § 1983 action against the State of Georgia, the Georgia Department of Corrections ("GDC"), and approximately 42 Georgia correctional officials. The district court's dismissal was based on two separate grounds: (1) the three-strikes provision in the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915(g); and (2) alternatively, as malicious and an abuse of the judicial process under 28 U.S.C. § 1915A(b)(1). After careful review, and with the benefit of oral argument, we affirm the district court's dismissal without prejudice.

## I. BACKGROUND

### A.    Daker's History as a Serial Litigant

Daker is an extraordinarily prolific serial litigant in the federal courts. In 2016, this Court pointed out that Daker had "submitted over a thousand pro se filings in over a hundred actions and appeals in at least nine different federal courts." Daker v. Comm'r, Ga. Dep't of Corr., 820 F.3d 1278, 1281 (11th Cir. 2016). In fact, the Public Access to Court Electronic Records ("PACER") database lists 296 civil actions and appeals filed in federal courts to date that

2

involve Waseem Daker.  As a serial litigant, Daker has "clogged the federal courts with frivolous litigation."  Id.

Some of Daker's cases have been dismissed for lack of jurisdiction or want of prosecution, which dismissals do not count as a strike under the three-strikes provision of the PLRA.  Id. at 1284-85.  However, Daker is now an admitted three-striker, as he has had many actions and appeals dismissed as frivolous or for failure to state a claim.  See Daker v. Jackson, 942 F.3d 1252, 1256-57 & n.4 (11th Cir. 2019) (listing six appeals Daker filed between May 26, 2016 and December 19, 2016 that were dismissed as frivolous and constituted "strikes" under the PLRA); Daker v. Robinson, 802 F. App'x 513, 515 (11th Cir. 2020) (identifying four cases that constituted strikes); Daker v. Robinson, No. 17-10329, slip op. at 3 (11th Cir. filed Oct. 4, 2017) (concluding for the first time on appeal that Daker "clearly qualified as a three-strikes litigant" based on five appeals dismissed as frivolous).

Further, since Daker was convicted of murder in 2012, he has filed at least 46 civil actions in the district courts of Georgia and at least 150 appeals in this Court.[1]  In addition, Daker has filed 28 U.S.C. § 2254 petitions that were dismissed

---

[1]Daker's days as a serial filer predate his 2012 murder conviction.  In 1996, Daker was convicted of aggravated stalking, for which he served a ten-year sentence.  Daker v. Ray, 275 Ga. 205, 563 S.E.2d 429 (Ga. 2002); see also Daker v. State, 243 Ga. App. 848, 533 S.E.2d 393 (Ga. Ct. App. 2000).  During this period of incarceration, Daker filed numerous actions in federal court, at least one of which involved similar challenges under the First Amendment and the Religious Land Use and Institutionalized Persons Act to the GDC's then-existing grooming policy.  See Daker v. Wetherington, No. 1:01-cv-3257 (N.D. Ga. filed Nov. 28, 2001).

3

or partially dismissed for raising claims that should have been brought in a civil action under § 1983.  See e.g., Daker v. Warden, 805 F. App'x 648 (11th Cir. 2020) (affirming dismissal of First and Eighth Amendment challenges to Daker's administrative segregation brought in § 2254 petition).

Daker has also attempted without success to intervene in civil actions filed by other Georgia prisoners, in part because his motions were deemed efforts to circumvent the requirement to pay a filing fee.  See, e.g., Daker v. McLaughlin, 806 F. App'x 939, 940 (11th Cir. 2020) (affirming district court's denial of Daker's motion to intervene where "Daker's complaint alleged different wrongs and different incidents at a different prison" because "Daker was not entitled to circumvent the requirement that he pay a filing fee, 28 U.S.C. § 1915(b), by intervening in another prisoner's lawsuit"); Gandy v. Bryson, 799 F. App'x 790, 792 (11th Cir. 2020) (concluding district court correctly denied Daker's motion to intervene because Daker was required under the PLRA to pay a separate filing fee).

Daker has not limited himself to the federal courts.  Recently, the Georgia Supreme Court described Daker as "an extraordinarily litigious defendant whose shenanigans can be frustrating for courts to deal with."  Allen v. Daker, ___ Ga. ___, 2021 WL 1950985, at *15 (Ga. filed May 17, 2021).  In so doing, the Georgia Supreme Court noted its own 2016 order "explaining that because Daker had filed

4

over 100 cases in this Court, virtually all lacking in merit and often showing a willingness to ignore or attempt to evade this Court's rules, he would henceforth be required to request leave to file any document here and to state that the document and arguments therein were prepared in good faith and not for vexatious purposes." Id.

Daker's abusive filing behavior has caused some federal courts to place filing restrictions on him as well. For example, in 2017, the U.S. Supreme Court directed its Clerk not to accept further noncriminal petitions from Daker unless the docketing fee is paid because Daker had "repeatedly abused this Court's process." Daker v. Toole, ___ U.S. ___, 138 S. Ct. 234 (2017) (mem.). More recently, in August 2020, Daker was permanently enjoined from filing new lawsuits or petitions in the federal district court in the Northern District of Georgia without first posting a $1,500 contempt bond in addition to paying the full filing fee.[2] See Daker v. Deal, No. 1:18-cv-5243 (N.D. Ga. filed March 3, 2020).

**B.    Daker's Current § 1983 Complaint**

On January 16, 2017, Daker filed this pro se complaint in the Middle District of Georgia seeking money damages and declaratory and injunctive relief under

---

[2]Daker's appeal of that permanent injunction is currently pending in this Court. See Daker v. Governor of Ga., No. 20-13602 (11th Cir. filed Sept. 21, 2020).

§ 1983. Along with his 35-page handwritten complaint, Daker filed a motion to proceed in forma pauperis ("IFP") under § 1915.

Daker, who is a practicing Muslim, asserted numerous violations of his rights under the First, Eighth, and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 et seq. Daker's complaint centered primarily on the GDC's enforcement of its grooming policy, which limits a prisoner's beard length to one-half inch. Daker's Islamic faith requires him to wear a fist-length beard of approximately three inches.[3]

More specifically, Daker's complaint claimed the GDC had a custom of: (1) enforcing its grooming policy with disciplinary actions, threats of force, and uses of force; (2) forced shaving with unsanitized and damaged clippers, which increased the risk of transmitting infectious diseases; and (3) disregarding the GDC's own standard operating procedures and the clipper manufacturer's instructions that required proper sanitation of clippers.

Daker's complaint also alleged he was housed at the Georgia Diagnostic and Classification Prison ("GDCP") in Jackson, Georgia and then at the Georgia State Prison ("GSP") in Reidsville, Georgia. Daker contends that at those prisons, he was "repeatedly forcibly shaved" with clippers that were unsanitized and damaged,

---

[3]We note that the issue of whether the GDC's half-inch beard restriction in its grooming policy violates RLUIPA is currently pending before this Court in Ward v. Smith, No. 19-13520 (11th Cir. filed Sept. 6, 2019). Nothing herein expresses any opinion on that substantive issue.

in violation of GDC's own standard operating procedures and the clipper manufacturer's instructions.[4]  Daker alleged specific incidents of forced shaving at GDCP "including but not limited to: on 11/21/2012, 12/11/2012, 11/22/2013, and other occasions."  As to GSP, Daker alleged forced shaving "on numerous occasions" and described, in particular, an incident on January 10, 2017, during which prison guards used force to carry him to the barbershop in handcuffs, where he was shaved with unsanitized clippers.  Daker claimed that a guard was instructed to tase him on his arm, but when he moved his arms to avoid being tased, he was sprayed with MK-9, a chemical agent, and suffered chemical burns on his hand and irritation to his eyes and throat.  Daker alleged being taken to the barbershop while handcuffed behind his back caused injuries to his shoulder and wrist and loss of feeling in his fingers.

Daker's complaint also alleged that in November 2016, before he was forcibly shaved in January 2017, he was denied a fair disciplinary hearing for his refusal to shave and then arbitrarily and without notice placed in Tier II disciplinary segregation.  Daker alleged that in Tier II he was denied outside exercise and access to religious services and materials, was not taken to orthopedist appointments for his injured shoulder, was housed in a dorm with prisoners who

_____

[4]Daker was housed at GDCP from October 3, 2012 to April 7, 2014 and then transferred to GSP, where he was housed when he filed this complaint in 2019.

threw feces, was placed in a cell with feces on the toilet and the floor and walls around the toilet, and was not given sanitation materials to clean the cell. As a result of his exposure to feces in Tier II, Daker was diagnosed with a sinus infection and treated with antibiotics.

## C.    District Court's Dismissal Order Without Prejudice

On July 18, 2017, the district court dismissed Daker's complaint without prejudice on two separate grounds: (1) as barred by the three-strikes provision of the PLRA, 28 U.S.C. § 1915(g), and alternatively (2) as malicious under 28 U.S.C. § 1915A(b)(1).

As to the three-strikes provision, the district court found that a review of court records on the PACER database revealed that Daker had at least three prior complaints or appeals that were dismissed and counted as "strikes under § 1915(g)." The district court already had confirmed Daker's status as a "three-striker in another case just last month," namely Daker v. Owens, No. 5:12-cv-459-CAR-MSH (M.D. Ga. filed May 8, 2017) (hereinafter referred to as "Daker I").[5]

---

[5]We refer to this case as Daker I because it appears to be the first of many complaints Daker has filed in the district courts in Georgia since being reincarcerated in 2012 that alleged, inter alia, claims arising out of forced shaving to enforce GDC's grooming policy. Indeed, by our count, Daker filed at least five other civil complaints asserting forced shaving claims after Daker I, but before the complaint at issue in this appeal, including:
    (1) Daker v. Head, No. 5:14-cv-138-MTT-CHW (M.D. Ga. filed Apr. 4, 2014);
    (2) Daker v. Head, No. 6:14-cv-47-RSB-BWC (S.D. Ga. filed May 19, 2014);
    (3) Daker v. Bryson, No. 5:15-cv-88-TES-CHW (M.D. Ga. filed Mar. 16, 2015);
    (4) Daker v. Bryson, No. 6:16-cv-57-JRH-RSB (S.D. Ga. filed May 23, 2016); and

The district court further noted that Daker had "repeatedly been barred from filing lawsuits within this Circuit under § 1915(g)" and that another district court in the Southern District of Georgia also had recently confirmed Daker's three-striker status in Daker v. Bryson, No. 6:16-cv-57-JRH-RSB (S.D. Ga. filed Mar. 20, 2017). Thus, the district court concluded § 1915(g)'s three-strikes bar to proceeding IFP applied to Daker's current complaint. The next question became whether Daker could avoid the three-strikes bar by satisfying § 1915(g)'s "imminent danger" exception.

However, before considering the "imminent danger" question, the district court considered whether Daker's claims were due to be dismissed under § 1915A(b)(1) as duplicative and as malicious and abusive. We thus discuss that issue first.

---

(5) Daker v. Bryson, No. 5:16-cv-538-TES-MSH (M.D. Ga. filed Dec. 7, 2016) and partly transferred as Daker v. Bryson, No. 6:17-cv-79-JRH-RSB (S.D. Ga. June 8, 2017). After Daker filed the instant complaint in January 2017, he went on to file at least an additional six civil complaints, including:
  (6) Daker v. Dozier, No. 5:17-cv-188-MTT-CHW (M.D. Ga. filed May 15, 2017);
  (7) Daker v. Dozier, No. 6:17-cv-110-JRH-RSB (S.D. Ga. filed Aug. 11, 2017);
  (8) Daker v. Dozier, No. 6:18-cv-32-JRH-BWC (S.D. Ga. filed March 26, 2018);
  (9) Daker v. Dozier, No. 6:18-cv-73-RSB-BWC (S.D. Ga. filed July 2, 2018);
  (10) Daker v. Dozier, No. 5:18-cv-245-TES-CHW (M.D. Ga. filed July 9, 2018); and
  (11) Daker v. Ward, No. 5:19-cv-126-MTT-CHW (M.D. Ga. filed Apr. 8, 2019).
In other words, Daker has filed at least 13 complaints asserting forced shaving claims in federal court over the last ten years.

**D.    Dismissal Without Prejudice Under § 1915A(b)(1)**

The district court concluded that Daker's current complaint was knowingly duplicative and therefore an abuse of the judicial process and malicious. The district court found that Daker had "previously made the same (or substantially similar) claims against various GDC and GSP defendants" and cited in particular Daker I and Daker v. Bryson, No. 5:16-cv-538-CAR-MSH (M.D. Ga. filed Dec. 7, 2016) (hereinafter referred to as Daker II), as "two other active cases in this Court against many of the same defendants named as parties in this case." The district court stressed that Daker had made "nearly identical" allegations in those two active cases, including "that: (1) the GDC's policies restricting inmates' beard length and access to religious services and/or materials violate[d] the First Amendment and RULIPA [sic]; (2) the policies and practices relevant to his assignment to Tier II confinement and the general conditions thereof violate[d] due process and the Eighth Amendment; (3) the current customs and practices relevant to disciplinary hearings violated due process; and (4) the practice [of] forcing prisoners to shave, or be forcibly shaven, with unsanitary, broken clippers violated the First and Eighth Amendments." The district court stressed that in Daker II, Daker had also previously raised his constitutional claims as to his conditions of confinement at GSP and the use of chemical agents to forcibly shave him in January 2017.

10

Based on a review of the pleadings in these two active cases (Daker I and Daker II), the district court found that "when [Daker] filed the present action in January of 2017, he knowingly brought claims that were essentially the same as those he was already actively litigating in, not one, but two other cases before this Court." In addition, the district court found that "in light of [Daker's] well-known history of filing frivolous and duplicative claims," his current complaint was "both malicious and an abuse of the judicial process."

## E. Imminent Danger and Dismissal Under § 1915(g)

Alternatively, the district court considered whether Daker could avoid § 1915(g)'s three-strikes bar to proceeding IFP and found that Daker's "assertions of 'imminent danger' are unwarranted." With respect to Daker's assertions that GSP guards used damaged and unsanitary clippers, the district court noted that Daker had made this claim in other actions and, "according to the Complaint, [Daker] ha[d] faced this same 'danger' since 2012," but Daker did not "identify any presently occurring circumstance to suggest that this possible or potential danger [was] any more imminent now than it was in 2012." Therefore, the district court concluded Daker's complaint failed "to show that the danger posed by the use of these clippers warrants an exception to the three-strikes bar."

As for Daker's allegations of a policy of forced shaving of inmates who refuse to shave voluntarily, the district court observed that Daker had not alleged

11

any injury when he was forcibly shaved at GDCP in 2012 and 2013 and had

alleged only that he was cut on some occasions while being forcibly shaved at GSP

"numerous" times. Daker had alleged that guards had used a chemical agent to

subdue him for his January 10, 2017 forced shave, but he had not alleged "a wide-

spread practice or custom" of using chemical agents or any other extreme use of

force during forced shaves. Thus, the district court concluded that Daker's

chemical agent allegation did not "suggest that another similar use of force [was]

imminent."

The district court also noted that Daker's allegations suggested that his

injuries were caused by his own repeated failure to follow instructions, not by

GDC's policies. At most, Daker's January 10 allegations "may have stated an

Eight[h] Amendment excessive force claim against the individual GSP

[d]efendants personally involved in the incident," but they did not "allow [Daker]

to escape the three-strikes bar."

Finally, as to Daker's allegations about his current conditions of

confinement at GSP, including being housed in unsanitary conditions and with

inmates who threw feces, the district court determined these allegations might

support a § 1983 claim, but they did not "demonstrate that [Daker was] presently in

danger of serious physical injury . . . ." The district court explained that nothing in

Daker's allegations suggested he would soon suffer a serious injury if, for example, he was not promptly moved to another dorm or given cleaning supplies.[6]

Accordingly, the district court denied Daker's motion to proceed IFP and dismissed his complaint without prejudice.

## F.    Appellate Proceedings

Daker appealed the district court's dismissal order and filed two motions for leave to proceed IFP on appeal. Daker's IFP motions were based on his allegations about the conditions of his confinement at GSP, including, inter alia, forced shavings of his beard with unsanitized clippers and the use of force to shave him, which he contended showed he was in imminent danger of serious physical injury. This Court, in a single judge order, concluded that Daker's imminent danger allegations as to GSP were moot because Daker had since been transferred first to Macon State Prison and then to Valdosta State Prison. Therefore, the GSP

---

[6]Alternatively, the district court concluded that, even if Daker's allegations as to his confinement conditions at GSP supported a finding of imminent danger, they were "unrelated to [Daker's] claims against the GDC Defendants." The district court pointed out that Daker was advised in Daker I and Daker II "that any claims arising from the conditions of his confinement at GSP should be brought in a separate suit and filed in the Southern District of Georgia, i.e., the appropriate venue for these claims." Thus, "in the alternative," the district court concluded Daker's claims regarding confinement conditions at GSP were due to be dismissed "not only because they are presently mis-joined, and the Middle District is not the proper venue, . . . but also because it [was] apparent that [Daker] knowingly, and in bad faith, mis-joined these claims for the sole purpose of attempting to avoid [the] three-strikes bar in a malicious abuse of the judicial process." The district court emphasized that Daker "still [had] active claims against the GSP defendants, which are the same or similar to those identified here" in Daker II, which had been transferred to the Southern District of Georgia. See Daker v. Bryson, No. 6:17-cv-79-JRH-RSB (S.D. Ga. June 12, 2017).

allegations "no longer [were] relevant to whether he is in imminent danger of serious physical injury." Accordingly, Daker was required to, and ultimately did, pay the appellate filing fee.

After designating Daker's appeal for oral argument, this Court appointed Daker counsel, who filed a new opening brief. At the Court's direction, the State of Georgia entered a limited appearance, the parties filed supplemental letter briefs, and the State of Georgia participated in oral argument.

## II.  STANDARD OF REVIEW

We review de novo a district court's dismissal of a complaint under the PLRA's three-strikes provision. Mitchell v. Nobles, 873 F.3d 869, 873 (11th Cir. 2017). We review the dismissal of a complaint as frivolous or malicious under 28 U.S.C. § 1915A for an abuse of discretion. See Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011). "Discretion means the district court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Zocaras v. Castro, 465 F.3d 479, 483 (11th Cir. 2006) (quotation marks omitted).

As noted above, the district court dismissed Daker's complaint on alternative grounds, which we address in turn.

14

### III.  SECTION 1915A(b)(1) DISMISSAL AS MALICIOUS

A district court must promptly screen a prisoner's civil complaint if, as here, it seeks redress from a governmental entity or one of its officers or employees.  28 U.S.C. § 1915A(a).  Specifically, § 1915A requires that the district court "identify cognizable claims" in the complaint and dismiss the complaint or any part of it that "is frivolous, malicious, or fails to state a claim upon which relief may be granted." Id. § 1915A(b)(1).  This preliminary screening is sometimes referred to as a frivolity review.

District courts are vested with broad discretion in determining whether to dismiss an action as frivolous or malicious under the PLRA's provisions.  See Camp v. Oliver, 798 F.2d 434, 437 (11th Cir. 1986) (addressing frivolity review in IFP proceedings).  In conducting a § 1915A frivolity review, a district court accepts the complaint's factual allegations as true and construes a pro se complaint liberally.  Bingham, 654 F.3d at 1175.

This Court has not yet addressed the meaning of "malicious" in § 1915A(b)(1) or its corollary, § 1915(e)(2)(B).  Other circuits, however, have concluded that duplicative actions are properly dismissed as frivolous or malicious. See, e.g., McWilliams v. Colorado, 121 F.3d 573, 574 (10th Cir. 1997) ("[R]epetitious litigation of virtually identical causes of action may be dismissed under § 1915 as frivolous or malicious." (quotation marks omitted, first alteration

15

in original)); Bailey v. Johnson, 846 F.2d 1019, 1021 (5th Cir. 1988) (same); Aziz v. Burrows, 976 F.2d 1158, 1158-59 (8th Cir. 1992) (confirming rule under former § 1915(d) that a district court may dismiss duplicative complaints as malicious); see also Pittman v. Moore, 980 F.2d 994, 995 (5th Cir. 1993) (concluding "it is 'malicious' for a pauper to file a lawsuit that duplicates allegations of another pending federal lawsuit" filed by the same plaintiff); Crisafi v. Holland, 655 F.2d 1305, 1309 (D.C. Cir. 1981) (explaining that a complaint "that merely repeats pending or previously litigated claims" is abusive and "[a] complaint plainly abusive of the judicial process is properly typed malicious"); Van Meter v. Morgan, 518 F.2d 366, 367 (8th Cir. 1975) (affirming the dismissal of a complaint as frivolous where the plaintiff proceeding IFP already had filed similar complaints, one of which was currently pending and "deal[t] with issues directly related, if not identical, to these herein"). We agree with our sister Circuits that a plaintiff's duplicative complaint is an abuse of the judicial process and is properly dismissed without prejudice as malicious under the PLRA.[7]

---

[7]Like § 1915A(b)(1), another PLRA provision, § 1915(e)(2), also requires a district court to dismiss a complaint that is "frivolous or malicious." See 28 U.S.C. § 1915(e)(2)(B)(i) (applying to complaints filed in IFP proceedings). Similarly, § 1915(e)(2)'s predecessor statute, former § 1915(d), provided that a district court "may" dismiss a complaint if the court was "satisfied that the action was frivolous or malicious." See 28 U.S.C. § 1915(d) (1996). This Court has reviewed all of these frivolity determinations for an abuse of discretion. As such, we find precedent applying any of these three provisions instructive on the issue of whether a district court has properly dismissed a complaint as frivolous or malicious under § 1915A(b)(1).

16

Here, the district court dismissed Daker's complaint without prejudice as "duplicative," "malicious," and "an abuse of the judicial process." The district court cited two pending § 1983 actions Daker had already filed in the Middle District of Georgia, Daker I and Daker II, as well as Daker's "well-known history of filing frivolous and duplicative claims." In the already-pending cases, Daker I and Daker II, Daker had asserted violations of his constitutional rights and RLUIPA arising out of: (1) forced shavings under the GDC's grooming policy with damaged and unsanitized clippers, and (2) his placement in Tier II disciplinary segregation and the conditions of confinement in Tier II. His Daker I & II complaints named many of the same defendants at the GDC and GSP as the complaint filed in this case. Daker filed all three complaints within a five-month period, while housed at GSP.

A.    **Daker I Amended Complaint filed September 5, 2016**

In particular, Daker filed the amended complaint in Daker I on September 5, 2016. In it Daker alleged, inter alia, that the GDC and GDCP had a custom of forcibly shaving prisoners with unsanitized and damaged clippers in disregard of the GDC's own standard operating procedures and the clipper manufacturer's instructions for proper sanitation of clippers, which increased the risk of transmitting infectious diseases. The amended complaint further alleged that the GDC and GDCP had a custom of enforcing the grooming policy with disciplinary

17

actions, threats of force, and uses of force.  These are the same custom allegations found in Daker's complaint filed in this case on January 16, 2017, less than five months later.

The Daker I amended complaint alleged that Daker, while at GDCP, was required to be clean-shaven in contravention of his Islamic faith and specifically alleged incidents of forced shaving with unsanitized clippers on November 21, 2012, December 11, 2012, and November 22, 2013.  These three forced shaving incidents are also alleged in Daker's complaint in this case.

The Daker I amended complaint included claims that: (1) Daker's April 11, 2016 assignment in Tier II housing without notice or a hearing violated his substantive and procedural due process rights, the Eighth Amendment, and RLUIPA; (2) various conditions of his confinement in Tier II violated his rights under the First Amendment and RLUIPA,[8] (3) the GDC's beard restriction violated his rights under the First Amendment and RLUIPA; (4) the custom of using damaged and unsanitized clippers during forced shaving increased the risk of infection with human immunodeficiency virus ("HIV"), hepatitis, or other

---

[8]Among other things, the Daker I amended complaint alleged Daker was denied these items: (1) religious books and publications, (2) a Jpay tablet computer used to email spiritual advisors, (3) religious observances such as Jumu´ah, Talim, and the Eid holiday salat and feast, (4) religious materials such as Islamic prayer oils, a miswak toothbrush, and a digital Quran. Daker's complaint in this case alleged the denial of these same items.

18

infectious diseases and violated the Eighth Amendment; and (5) the custom of using force and threats of force to shave prisoners violated the Eighth Amendment.

## B.    Daker II Complaint Filed December 4, 2016

Daker filed the complaint in Daker II on December 4, 2016, just two months after his complaint in Daker I. The Daker II complaint contained the same allegations of a custom of using force and of using unsanitized and damaged clippers to shave prisoners. The Daker II complaint alleged that Daker was repeatedly forcibly shaved with unsanitized and damaged clippers while at GDCP, "including but not limited to" November 21, 2012, December 11, 2012, and November 22, 2013," the same dates alleged in both Daker I and in this case. In addition, the Daker II complaint alleged that Daker was repeatedly forcibly shaved while at GSP, including but not limited to, twelve occasions between April 10, 2014 and March 20, 2015. The Daker II complaint also described a specific incident of forced shaving on November 10, 2016, during which guards used physical force and a chemical agent, MK-9, injuring Daker's shoulder and causing cuts, bruises, and burns, and that afterward Daker was placed in Tier II segregation without notice or a hearing. This November 10, 2016 incident was also mentioned in Daker's complaint filed in this case.

Like the complaints in Daker I and in this case, the Daker II complaint alleged that: (1) Daker's April 11, 2016 placement in Tier II housing violated his

19

due process rights and the First and Eighth Amendments; (2) the custom of using damaged and unsanitized clippers to forcibly shave prisoners violated the Eighth Amendment; (3) the custom of using force, including the chemical agent MK-9, to shave prisoners violated the Eighth Amendment**]**; and (4) the beard restriction in the GDC's grooming policy violated Daker's First, Eighth, and Fourteenth Amendment rights and RLUIPA.

## C.    Daker's Current Complaint Was Knowingly Duplicative

Less than five months after Daker I's amended complaint and less than seven weeks after Daker II's complaint, Daker filed the complaint at issue here on January 16, 2017.  After reviewing the complaints in Daker I and Daker II, we agree with the district court that, when Daker filed his complaint in this case, he had already raised "essentially the same" allegations and claims in either Daker I or Daker II, or both, and that his other two actions were still pending before the same district court judge.[9]

Moreover, we find no error in the district court's finding that Daker brought his duplicative complaint in this case knowingly.  Daker is an experienced pro se litigator and filed all three complaints in the Middle District of Georgia over a period of five months.  Given that Daker knowingly filed this complaint containing

---

[9]Notably, this Court recently affirmed the district court's dismissal of the Daker II complaint as duplicative of the Daker I complaint and malicious under § 1915(e)(2)(B).  See Daker v. Bryson, 841 F. App'x 115, 120-21 (11th Cir. 2020).

20

claims duplicative of claims he had already asserted in two other pending civil actions, and in light of his history as a prolific serial filer, the district court did not abuse its discretion by dismissing this third complaint without prejudice as "malicious" under § 1915A(b)(1).

## IV.  SECTION 1915(g)'S THREE-STRIKER BAR

An indigent prisoner, like Daker, seeking to bring a civil action ordinarily may proceed without prepayment of the filing fee and instead may proceed IFP, paying the fee in installments.  28 U.S.C. § 1915(a)(2), (b).  However, under § 1915(g), commonly known as the PLRA's "three strikes" provision, a prisoner is prohibited from proceeding IFP if the prisoner has brought three or more federal lawsuits or appeals that were dismissed as frivolous, malicious, or for failure to state a claim, as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g); see also Mitchell, 873 F.3d at 872.  When a prisoner with three strikes is denied IFP status under § 1915(g), the proper course is to dismiss the prisoner's complaint without prejudice.  Mitchell, 873 F.3d at 872.

21

On appeal, Daker does not dispute the district court's determination that he is a three-striker. Thus, the issue became whether the allegations in Daker's complaint satisfy § 1915(g)'s imminent danger exception.

## V. IMMINENT DANGER EXCEPTION

A prisoner with three strikes can avoid § 1915(g)'s bar to proceeding IFP only by showing that he is "under imminent danger of serious physical injury." Id. (quotation marks omitted). To satisfy this exception, the prisoner must show he is in imminent danger "at the time that he seeks to file his suit in district court . . . ." Medberry v. Butler, 185 F.3d 1189, 1192-93 (11th Cir. 1999) (quotation marks omitted). "Allegations that the prisoner has faced imminent danger in the past are insufficient to trigger this exception to § 1915(g)." Id.; see also Brown v. Johnson, 387 F.3d 1344, 1349 (11th Cir. 2004) (stating the "prisoner must allege a present imminent danger, as opposed to a past danger, to proceed under section 1915(g)").

In determining whether a prisoner has proved "imminent danger of serious physical injury," this Court looks to the complaint, construing it liberally and accepting its allegations as true. Brown, 387 F.3d at 1350. In so doing, the Court considers "whether [the prisoner's] complaint, as a whole, alleges imminent danger of serious physical injury," not whether each specific physical condition or affliction alleged alone would be sufficient. Id.; Mitchell, 873 F.3d at 874. General assertions, however, are "insufficient to invoke the exception to § 1915(g)

22

absent specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury." Brown, 387 F.3d at 1350 (quotation marks omitted).

## A.    Daker's Prior Imminent Danger Appeals

As for Daker's allegations that the use of unsanitized and damaged clippers increased the risk of transmitting infectious diseases, we note that this Court has repeatedly concluded in unpublished decisions that these allegations are too speculative to constitute imminent danger.  See Daker v. Robinson, 802 F. App'x at 515; Daker v. United States, 787 F. App'x 678, 681 (11th Cir. 2019); Daker v. Bryson, 784 F. App'x 690, 693 (11th Cir. 2019).

For example, in Daker v. Bryson, our Court concluded that Daker did not "face[ ] anything near the imminent danger of suffering serious or continuing harm" based on his allegations of being forced to shave with unsanitized clippers. 784 F. App'x at 693.  The Court stressed that "nothing suggest[ed] that he [was] suffering from any current consequences," and the mere allegation that "being forced to use unsanitized clippers could expose him to diseases" was "simply too speculative to establish that he [was] under imminent danger of serious physical injury." Id.  Likewise, in Daker v. United States, this Court concluded that Daker's allegation that "using unsanitary and damaged clippers on his beard might increase

his risk of contracting an infectious disease was too speculative to constitute imminent harm." 787 F. App'x at 681.

Most recently, in Daker v. Robinson, Daker claimed "he met the imminent danger requirement because [GDC] officials 'forcibly shaved Plaintiff with unsanitized clippers on several occasions,' 'cutting him' and burning him in the process, on another occasion 'twice banged his head against the wall' and 'as a result, Plaintiff is still at risk of use of force and infection with HIV, Hepatitis, and other infectious diseases.'" 802 F. App'x at 515. This Court concluded that Daker's claims of past harm were insufficient and his "allegations of future harm arising from the use of unsanitized clippers [were] too speculative to meet the imminent danger standard . . . ." Id. Although not bound by this precedent, we agree with it.

Daker's allegations do not sufficiently allege that he was under imminent danger of serious physical injury when he filed his complaint in 2017. Accepting Daker's allegations as true, pursuant to GDC's policy at the time he filed his complaint, Daker would be forcibly shaved whenever his beard was longer than one-half inch and he refused to shave it himself. Moreover, the prison official doing the forced shaving might use damaged and unsanitized clippers, which in the past had sometimes caused cuts. However, Daker's claim that being forcibly shaved with damaged and unsanitary clippers could expose him to an infectious

disease like HIV or hepatitis is too speculative to establish he was under imminent danger.

To be sure, actually contracting HIV or hepatitis would constitute a serious injury. But Daker does not allege that any inmate at GSP or any other GDC prison (or any prison anywhere) has contracted an infectious disease like HIV or hepatitis through forced shaving of a beard or even such forced shaving with unsanitary clippers. And, as his own allegations establish, Daker has been subjected to forced shavings since 2012, and yet he has not contracted an infectious disease as a result.

If GDC's practice of forcibly shaving Daker truly posed an imminent danger to him, he arguably would have contracted an infectious disease at some point in the last eight years. We need not, however, go that far. It suffices to say that Daker's own allegations indicate that the risk of transmission is very low, especially given that he also alleges it is GDC's longstanding custom to use damaged and unsanitary clippers on its prisoners. Daker's allegations certainly do not indicate the risk of transmission is high or imminent. Even construing Daker's allegations liberally, Daker's complaint establishes only that it is possible he could contract an infectious disease but says nothing about whether it is probable or likely.[10]

---

[10] "To determine the ordinary meaning of an undefined statutory term, we often look to dictionary definitions for guidance." Spencer v. Specialty Foundry Prods. Inc., 953 F.3d 735, 740 (11th Cir. 2020) (internal quotation marks omitted). The word "imminent" is generally

25

We do not suggest Daker needed to allege he had already contracted an infectious disease through the use of damaged and unsanitized clippers in order to meet the imminent danger standard.  Rather, we conclude Daker's mere allegation that he could contract an infectious disease, without any other allegations to establish the likelihood of this happening soon, is not sufficient to show contracting an infectious disease was "imminent" for purposes of § 1915(g).  Simply put, the fact that something, even something very serious like contracting HIV or hepatitis, <u>could</u> happen does not mean it is <u>about to</u> happen and is therefore imminent.

## B.    Other Imminent Danger Claims

The force used to effectuate GDC's grooming policy also does not present imminent danger of serious physical injury.  First, as for the force allegedly used during the January 10, 2017 forced shaving, allegations of past danger cannot

---

understood to mean "ready to take place" or "happening or likely to happen very soon." *Imminent*, <u>Merriam-Webster's Unabridged Online Dictionary</u>, https://unabridged.merriam-webster.com/unabridged/imminent (last visited June 2, 2021).  In legal parlance as well, imminent means something that is "dangerously impending," "threatening to occur immediately" or "[a]bout to take place." *Imminent*, <u>Black's Law Dictionary</u>, (11th ed. 2019).

In other words, for a danger to be "imminent" for purposes of § 1915(g), it must be about to happen or likely to happen very soon.  Yet, if the risk of transmitting an infectious disease is low, it is difficult to see how contracting one could be "imminent."  Since Daker did not allege any facts to suggest he was about to or likely to contract an infectious disease very soon, he did not establish an "imminent danger" of contracting an infectious disease from the use of damaged and unsanitary clippers.

establish a present imminent danger.  See Medberry, 185 F.3d at 1192-93; Brown, 387 F.3d at 1349.

Second, to the extent force would be used in future, the kinds of minor injuries Daker alleges were caused by being forcibly shaved, such as burns, cuts, and bruises, fall short of the seriousness of injury that this Court has found satisfies the imminent danger standard.  See Brown, 387 F.3d at 1350; Mitchell, 873 F.3d at 874.  For example, in Brown, this Court determined that the prisoner had sufficiently alleged imminent danger where his complaint averred a "total withdrawal of treatment for serious diseases [of HIV and hepatitis], as a result of which he suffer[ed] from severe ongoing complications, [was] more susceptible to various illnesses, and his condition [would] rapidly deteriorate."  387 F.3d at 1350.  Similarly, in Mitchell, we held that the prisoner had sufficiently alleged imminent danger where he claimed the defendants had completely withdrawn treatment for hepatitis, and cirrhosis had begun.  873 F.3d at 873-75.  On the other hand, in Medberry, we concluded that a complaint failed to sufficiently allege imminent danger where the prisoner was placed in protective confinement after an assault, and he merely feared being returned to the prison's general population.  185 F.3d at 1192-93 (explaining the threat had ceased and the complaint had not alleged the prisoner was in jeopardy of any ongoing danger of physical assault).

27

In contrast to the prisoners in <u>Brown</u> and <u>Mitchell</u>, who had life-threatening diseases for which prison officials were withholding necessary treatments, Daker does not allege that prison officials' conduct in forcibly shaving him would likely cause long-term or severe damage to his health.  Similarly, Daker's allegations of being placed in Tier II disciplinary confinement, being assigned to a dorm with inmates who threw feces, being placed in an unsanitized cell, missing several orthopedist appointments, and being deprived of outside exercise also do not rise to the level of imminent danger of serious physical injury.

In sum, Daker's complaint, as a whole, does not sufficiently allege that he was under imminent danger of serious physical injury.  Therefore, the district court did not err in alternatively dismissing Daker's complaint as barred by the PLRA's three-strikes provision.

## VI.  CONCLUSION

For the foregoing reasons, we affirm the dismissal of Daker's complaint without prejudice.

**AFFIRMED.**

28

ROSENBAUM, Circuit Judge, concurring in part and dissenting in part:

I agree with much of the panel's opinion. I write separately only because I disagree that alleging an unofficial policy and practice of shaving prisoners with unsanitized and damaged clippers on a recurring monthly basis cannot satisfy the imminent-danger standard.[1]

Here, Waseem Daker alleged that "CONTRARY TO THEIR OWN [standard operating procedures], ALL DEFENDANTS MAINTAIN A CUSTOM IN [Georgia Department of Corrections] PRISONS OF DISREGARDING THE MANUFACTURER'S INSTRUCTIONS AND [Georgia Department of Corrections standard operating procedures] AND OF REFUSING TO PROPERLY SANITIZE CLIPPERS AND OF USING CLIPPERS WITH BROKEN GUARDS OR OTHER DAMAGE THAT EXPOSES THE SKIN TO SHARP EDGES AND

---

[1] The panel notes that in *Daker v. Robinson*, 802 F. App'x 513, 515 (11th Cir. 2020), we "concluded that Daker's 'allegations of future harm arising from the use of unsanitized clippers [were] too speculative to meet the imminent danger standard . . . .'" Maj. Op. at 24. Because I was a part of that panel, I pause to note that in that case, unlike here, the subject matter of Daker's complaint did not relate to his imminent-danger allegations of being shaved with damaged, unsanitized clippers. *See id.* For the fuller context, we actually stated that "Daker's allegations of future harm arising from the use of unsanitized clippers are both too speculative to meet the imminent danger standard *and too far attenuated from the crux of the complaint—that state actors mishandled his state cases.*" *Id.* (emphasis added). I agreed that Daker's claims of imminent danger could not propel him past the three-strikes rule since they did not relate to the substantive claims in his complaint, and that fact required dismissal regardless of whether Daker's unsanitized-clippers claims satisfied the imminent-danger standard. The opinion was also unpublished and therefore not binding on any court. For those reasons, I joined it. And for those same reasons, to the extent that the Majority Opinion here may be construed to suggest that my position in the instant case is inconsistent with my position in *Robinson*, I respectfully disagree.

OF INCREASED RISK OF BEING CUT, WHICH CUSTOM EXPOSES PRISONERS TO INCREASED RISK OF INFECTION WITH HIV, HEPATITIS, AND OTHER INFECTIOUS DISEASES, WHICH ARE ALREADY COMMON IN THE PRISON POPULATION." And he asserted that "DEFENDANTS . . . MAINTAIN A CUSTOM OF NOT TRAINING EMPLOYEES TO SANITIZE CLIPPERS OR TO NOT USE DAMAGED CLIPPERS."

Yet Daker also claimed that the clippers manufacturer's instructions direct that the clippers "SHOULD BE PROPERLY CLEANED AND SANITIZED AFTER EVERY USE TO PREVENT SPREAD OF HIV, HEPATITIS, AND OTHER INFECTIOUS DISEASES."

No wonder. The American Barber Institute ("ABI") notes that "[a]mong the diseases that have the potential to be transmitted at a hair or nail salon, hepatitis B and C pose the biggest threat to public health." "State of the Appearance Enhancement Industry, *American Barber Institute*, https://www.abi.edu/about/state-of-the-industry (last visited June 7, 2021). According to the ABI, "[h]epatitis B can be infectious for at least a week on . . . tools and instruments[,] . . . [and] hepatitis C . . . can be transmitted by razors . . . [and] clippers . . . ." *Id.*

The medical evidence confirms what the ABI says. The Centers for Disease Control and Prevention ("CDC") warns that hepatitis can spread "from sharing . . . razors . . . and other items that may have come into contact with infected blood, even

30

in amounts too small to see." https://www.cdc.gov/hepatitis/HCV/PDFs/HepC GeneralFactSheet.pdf. And according to the *South African Medical Journal* ("SAMJ"), "there is significant contamination of barber hair clippers with blood and blood-borne viruses." Z. Spengane, *et al.*, "Blood and Virus Detection on Barber Clippers," *S. Afr. Med. J.*, Vol. 108, No. 4, at 278 (2018). In the SAMJ project, researchers collected a total of 50 clippers after barbers both used them on patrons and then cleaned the instruments. *Id.* at 279, 280. Despite cleaning, 42% of the gathered clippers still tested positive for the presence of blood, and researchers specifically identified hepatitis B on 8% of the clippers. *Id.* at 280. Not only that, but they concluded that the quantities of hepatitis B virus were high enough "to pose a risk of infection." *Id.* at 282.

And that's when the clippers were actually cleaned. Here, Daker asserts that the clippers are not disinfected in any way, they are damaged, *and* they are used on a population statistically known to include those with bloodborne diseases at significantly greater rates than in the general population.[2]

---

[2] In 2015, the Bureau of Justice Statistics identified the rate of the presence of hepatitis as 10.9% of the state and federal prisoner population (and the rate of HIV/AIDS as 1.3%). Laura Maruschak, et al., "Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012," Bureau of Justice Statistics (BJS) (Feb. 2015), at 3, https://bjs.ojp.gov/content/pub/pdf/mpsfpji 1112.pdf. And the Bureau found that, in comparison to the rest of the population, nine times as many prisoners have suffered from hepatitis at some point during their time in prison than individuals in the general United States population (and about four times as many have HIV/AIDS). *See id.* at 4. Another study printed in the *Annals of Internal Medicine* concluded that hepatitis C is about 17 times more prevalent in the United States prison population than in the general population. Tianhua He, M.D., *et al.*, "Prevention of Hepatitis C by Screening and

On top of that, certain Georgia prison practices only compound this risk of contracting blood-transmitted diseases. For example, Georgia's state prisons do not track the number of prisoners with hepatitis C.[3] Georgia is also one of four states that lacks clear written rules for testing and treating hepatitis C. *See* Miller, *supra* n.2. So prison barbers may not know when they have used clippers on an infected person.

These facts show that, contrary to what our unpublished (and therefore nonbinding) opinions conclude, the science demonstrates a significant risk that hepatitis can be transmitted through unsanitized, damaged clippers. And monthly shavings with those instruments necessarily augments the chances of that occurring. Indeed, accepting Daker's allegations as true, as we must, we know that the Georgia Department of Corrections also must recognize this real risk because its standard operating procedures require Georgia officials to clean and sanitize clippers after each use. And those same standard operating procedures instruct that damaged

---

Treatment in U.S. Prisons," *Annals of Internal Medicine*, 84 (2016). Whatever the actual frequency, all agree that the hepatitis infection rate in the prison population "is much higher" than among the general population. Andy Miller, "The High Cost—and Treatment Gap—in Curing Inmates with Hepatitis C," *Georgia Health News* (July 20, 2018), www.georgiahealthnews.com/2018/07/high-cost-treatment-gap-curing-inmates-hepatitis/ (last visited June 7, 2021).

[3] The *Georgia Health News*, which reported that Georgia's state prisons do not track the number of prisoners with hepatitis C, does not appear to have inquired whether Georgia's state prisons keep a tab on the number of prisoners with hepatitis B. Miller, *supra* n.2. But both hepatitis B and hepatitis C are transmitted through contact with infected blood. *See* https://www.cdc.gov/hepatitis/resources/professionals/pdfs/abctable.pdf. So if Georgia prisons track one, it would make sense for them to track the other. And if they do not track one, it seems a reasonable inference that they do not track the other, either.

clippers "shall not be used."   Similarly, the clippers manufacturer directs that clippers be sterilized with virucide after each use.

The panel recognizes that "actually contracting HIV or hepatitis would constitute a serious injury."  Maj. Op. at 25.  The problem, it says, is that "Daker does not allege that any inmate at GSP or any other GDC prison (or any prison anywhere) has contracted an infectious disease like HIV or hepatitis through . . . shaving with unsanitary clippers."  *Id.*

But that is an impossible hurdle to clear for two reasons.  First, hepatitis may be transmitted in a variety of ways, including by having sexual contact with an infected person; sharing an infected person's needles, razors, or toothbrush; or by otherwise experiencing an exchange of blood or other bodily fluids with an infected person.  *A Visual Guide to Hepatitis*, WebMD, https://www.webmd.com/hepatitis/ ss/slideshow-hepatitis-overview (last visited June 7, 2021).  As a result, identifying the specific origin of a hepatitis infection in a given prisoner can be difficult, if not impossible, to do in a prison setting—if the prison is even inclined to try.  *Cf.* "State of the Appearance Enhancement Industry," *supra* 2 ("According to Dr. Harold Oster, a San Diego Infectious Disease Specialist, 'The risk of (HIV) infection at a barbershop is not zero . . . and there are many cases where the means of transmission is not known for certain.'").  And second, even if a prison successfully engaged in this unlikely data collection, privacy laws would preclude it from identifying any

33

specific prisoner who had contracted hepatitis or publicly reporting such findings—regardless of how the prisoner had developed his illness.

So as a practical matter, the question before us cannot be whether Daker has shown that other prisoners have contracted hepatitis as a result of the Georgia Department of Corrections's allegedly routine use of unsanitized, damaged clippers. Rather, it must be whether, as a matter of scientific knowledge, the allegations allow a court to draw reasonable inferences that there is a danger that a prisoner repeatedly shaved with unsanitized, damaged clippers used previously on other prisoners at the Georgia Department of Corrections will contract hepatitis. *See Vandiver v. Prison Health Servs., Inc.*, 727 F.3d 580, 585 (6th Cir. 2013) (explaining that the prisoner's allegations "must be sufficient to allow a court to draw reasonable inferences that the [alleged] danger exists"). The evidence shows that Daker's allegations satisfy this standard.

For starters, this is not a case where the prisoner's claims of imminent danger "are conclusory or ridiculous, or are clearly baseless (i.e. are fantastic or delusional and rise to the level of irrational or wholly incredible)." *Vandiver*, 727 F.3d at 585 (citation and internal quotation marks omitted); *see also Ciarpaglini v. Saini*, 352 F.3d 328, 330-31 (7th Cir. 2003); *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010); *Gibbs v. Cross*, 160 F.3d 962, 967 (3d Cir. 1998).

34

To the contrary, the CDC expressly warns against the risk of hepatitis transmission through unsanitized razors, which are necessarily a part of unsanitized clippers. I do not think we should second-guess the CDC, which is the medical expert on these things.

Plus, as I have explained, a study appearing in the *South African Medical Journal* involving cleaned clippers that were not damaged revealed that 42% of used and cleaned clippers collected from barbers in the general population in South Africa during that study bore blood on them, and 8% carried hepatitis B. Not only that, but researchers found the virus present in large enough quantities to cause infection in another person. Obviously, when, as Daker alleges here, clippers are not sanitized and are damaged, thereby increasing the likelihood of nicks and cuts, the risk of transmission is only exacerbated.

As if that's not enough, the Georgia Department of Corrections has itself recognized the risk that unsanitized and broken clippers represent by adopting regulations requiring clippers to be sanitized and damaged clippers not to be used. In short, there is no question that diseases like hepatitis can be transmitted through the use of damaged, unsanitized clippers previously used on a person with a bloodborne illness. And that is enough to establish imminent danger of serious injury. *See Andrews v. Cervantes*, 493 F.3d 1047, 1055, 1057 (9th Cir. 2007) (the allegation that a prisoner is at risk of contracting hepatitis "more than plausibly raises

35

the specter of serious physical injury.  Th[is] disease[] quite obviously cause[s] serious health problems, and can result in death."); *see also id.* at 1057 n.12 (recognizing that the Centers for Disease Control and Prevention have "specifically warn[ed] against sharing razors or toothbrushes in order to prevent the spread of . . . hepatitis C").

For these reasons, I would conclude that Daker alleged sufficient facts to establish imminent danger of serious bodily injury.

36